The issue in this case is whether the failure by the FBI agent who conducted the interrogation to give Miranda warnings should have required suppression. The outcome in this case, we believe, is determined by this court's decision in Craighead. When a person is questioned in his home under Craighead, the issue is whether there was such police domination that the person was in custody for purposes of Miranda. There were ten police officers here? Twelve, Your Honor, from six different agencies. In Craighead, there were eight officers from three agencies. This is far in excess of that. We had twelve different officers from six different agencies. Six FBI agents, including the interrogating agent Klaus Frantz, a postal inspector whose name was Brian Bone, two Murrieta Police Department policemen, one San Bernardino policeman, a Riverside County sheriff, and a Riverside City police officer. Let's assume for a minute that certainly I would agree with you, based on my dire concurrence, that he was in custody. But what do you do with United States v. Patain, a Supreme Court opinion that says that non-testimonial physical fruits are not, you don't have to exclude them, even if there's no Miranda warning? In that regard, Judge Smith, Patain case controls. There are two discrete issues before the court, one of which is the admissibility of the statements. So the admissibility of the statements and the ruling on the Miranda issue does not control, and under Patain, cannot control, the second separate issue about the admissibility of the tangible evidence that was seized. Help me on the nexus issue here. Assuming I agree with you about that he was in custody and that the statements made are not, we can't use those, they can't use those. But I'm having some difficulty tying that with the fact that the physical fruits as found in the computer would somehow also be excluded. The computer was there, right? I mean, it's not like it's, they need his testimony to tie that together. No. Let me, if I could just... I thought you just said that they wouldn't be excluded. On the basis of the statement, in other words, if the statement is inadmissible, that does not affect the fruits if they're obtained as a result of the Miranda violation. The basis for a motion to suppress in the district court was not based on the Miranda violation. It was based on a separate argument having to do with three of the computers not being properly searched under the procedures of the search warrant. But they're discrete issues. But that seems to mean that if we don't buy your second argument that the search results come in and then the statements don't matter very much. Well, technically, Judge Berzon, we made this plea pursuant to Rule 11a2. And if we prevail on either issue, the defendant is entitled to withdraw the plea. The determination that we made was with the evidence plus the statements, we were in a very bad position. But if the statements go out, that may change the assessment. But you're still... But formally... The problem I have, we've got a Fourth Amendment issue and a Fifth Amendment issue. And if there is no Fourth Amendment violation, he still had 2,000 images on the computer that was covered by the warrant. And we've got his post-search, self-initiated phone calls to the FBI in which he makes admissions that he is still surfing child pornography sites. So I'm not sure where this all ends. If we grant you the relief that you're asking for and we reverse and remand, isn't he still going to be guilty of receipt and possession of child pornography? I do not want to be guilty of the sin of hubris and assumed I've won the first issue before I really have. But since my time is limited, I hope I can be guilty of that sin and go to the computer issue if I might. Let's assume, arguendo, that he was in custody. So let's take it from there because I think that's... If you have an argument, that's where it is. Here it is. The search warrant protocol in this case was very specific. Well, it was very specific in saying that if they had other reason... It only plugged in if they needed to rely on the technical searches. But if they had other basis for thinking that these computers had child pornography, and they did, the statements. So if the statements, if that connection between the statements and the search doesn't matter, even if he was in custody and it was a Miranda violation, then the protocol does not require the steps that you suggest they had begun through. Judge Berzon, I have to make a distinction here. There were five computers. One of the computer and its contents are admissible, clearly. I thought that he said that there was child pornography in all of them. I'm sorry? He didn't say there was child pornography in all of them? No, and I need to refer the court specifically to pages 109 and 110 of the excerpt of clerk's record. That is the 302 of the special agent, Klaus Franz. What the defendant said was, you're going to find child pornography on the computer, the laptop in my bedroom. Probably 50% of that is child pornography. And then he said he had, in addition to that, two other computers. And then they found another two computers at a later time. And at some unspecified time, according to the 302, they said, well, are we going to file child pornography on the other computers? And the answer was, maybe, or you might. Now, that was transmuted in the government's brief into he admitted that there was. Well, true, but if the question is probable cause and he, who knows whether it's there, says you might find it, that's a pretty good guess that you're going to find it. Judge Berzon, let me just suggest this, that if there were an unequivocal 100% admission, yes. But given what is being seized, the computers, and given this court's en banc decision in comprehensive drug testing, we're talking about the seizure of something that not is simply one contraband item, but basically contains the person. I was on that comprehensive drug testing case, and I don't see what that has to do with that. That was a plain view argument. And here we're really talking about, as Judge Berzon indicated, it's probable cause. And in this case, your client allegedly said, you know, your, I think the wording was, that he would likely find child pornography on each of the computers. Would likely find. That's enough, isn't it? That's the argument in the brief. If you'll look at the words that are on pages 109 and 110 of the 302, it's you might. There might be some. It's not, it's, I mean, I'm looking at 110, and Agent Franzi writes, Clymer believed all computers in his possession might have images of child pornography. He oftentimes would save his child pornography onto CDs as a backup, due to the many viruses he received on most of his computers. Clymer added that he saved almost everything he ever saw. Why couldn't a reasonable agent believe that your client was admitting to having child porn on all of the electronic devices? I don't quarrel with the initial seizure, but what I'm saying is, in light of the equivocal admissions and the protocol set forth in the ruling. I guess the problem is I don't find that admission equivocal, counsel. I mean, I think that's enough, given a common sense view that we must apply, in the Fourth Amendment context, that a reasonable agent could believe that he was admitting there was child porn on everything. Well, let me do this. I have one minute left. Can I just say one other thing? Of course. He also called them afterwards, and started talking some more about what was on the computers, didn't he? That is correct, and that's not the subject of this appeal. Well, I understand that, but isn't that more evidence that there was child porn on those computers before they actually searched the computers? Not at all. There was child pornography on one computer, and he admitted that, and he was sure of that, and that was at the time. I'm talking about the phone calls. There was never any statement in the later phone calls about the other computers or whether it would be on one as opposed to the other. There were five computers here. But in any event, under the terms of the 11A2 entry of the conditional plea, we are entitled, if we win on the first issue, to be sent back to the district court. But I still didn't get an answer to the question I asked you, and that was what difference does this all make? If we grant you the relief you're asking for, you're still faced with more than 2,000 images and his post-search admissions. Let me just say that we did not focus on the specifics of those statements, but that it may very well be that there was some exaggeration in the agent's this is the argument we can make in the district court. Exaggeration as to what? I mean, the images are there. They speak for themselves. Your client initiated the two phone calls where he admits that he's continuing to look at child pornography. But you're representing that you would have the authority to withdraw the plea and that you would? Yes. That was the whole purpose for the entry of the plea under Rule 11A2. I am over my time. Do you believe we are bound by that stipulation? In other words, if we find in the record, as my colleagues have indicated here, clear evidence that he acknowledged enough about what was in those computers, that that took care of it, that somehow we have to send this back, is that your position? Judge Smith, that's the very purpose for Rule 11A2, and this was discussed in the advisory committee notes, that the issue that is reserved for appeal need not be dispositive. And you'll forgive me, I don't mean to. But we can affirm on any ground, can we not? You can affirm on any ground, but the issue is not whether there was sufficient evidence. The issue is whether the statements were properly admissible or in the alternative. And I believe that the question that we have to ask ourselves is whether there was sufficient evidence that the plaintiff, as a second independent basis under Rule 11A2 for prevailing. Because your position, as I understand it, is that the question is whether the plea stands, and that under this agreement the plea would not stand. And you're representing to us that you would, in fact, withdraw the plea. Yes. Okay. Thank you. May it please the Court. Kristen Williams, United States. The Court's questions have focused considerably on the second question, this question of the motion to suppress the act. Can I just ask you whether the structure of this is correct, as your opponent is representing? That is, that the plea agreement provides that the plea can be withdrawn if either of these prevails, and therefore the connection between them is not our problem. That is my understanding, is that the plea condition was as to either of the motions. So even if we thought that all of this would come in any way, all of what was on these five computers would come in any way, he gets to withdraw his plea as this agreement is written. I think as the agreement is written, I agree that it appears to me as though it does not really serve judicial economy, because I think Your Honors are right, that we have a considerable amount of statements that are made after. Statements which he did say on page 114 of the record that he believed his computers would contain the act. But essentially he was free to enter into the plea agreement the way, as long as you agree to it, the way he wanted to enter into the plea agreement, and that's how he entered it. Yes, and that's correct. All right. So go ahead. But then in this case, obviously we have not only the conceded computer, the bedroom laptop, with the multiple, we have the failure to argue about the CDs that were seized, which had much of the downloaded child pornography. So even if it was sent back, there would be all of those issues as well. But that still confirms what you said to Judge Berzon, that even if your opponent's client has absolutely no chance on a remand, you're saying that if either of these prongs is as discussed, that he has a right to withdraw the plea. He says he will, and you're right back where you started from. That is my understanding about the agreement that we entered into for the conditional plea, Your Honor. But I'd like to turn back to the issue of the question of custody and the question of whether or not the defendant was in custody during when the statements were made, since I think there were some, there hasn't been as much discussion on that point. In this case, the defense points to the case of Craighead, which I think is quite distinguishable on its facts. The defense has primarily pointed to the language in Craighead, the language about that the statement that one is not under arrest, not being alone, or not being enough in a vacuum when you have other scenarios that are pointing towards custody. But in this case, we don't have the situation where we had in Craighead with a small... Well, let me ask you something. When they said he was free to leave... Yes, Your Honor. They didn't mean he was free to stay there and not talk to him. Your Honor, he was asked if he would like to speak with him. Right. So I think you can take that either option. But they said to him that he was free to leave, but they didn't say to him, and you can just sit here if you want to. Not leave. You can not leave. You can just sit here. Your Honor, I don't think it's clear from the record that that's the case. I think they were, they asked him if he would like to speak with them. He was told he would not be under arrest, that nobody would be going to jail. But I don't think that... 12 policemen wandering around, and you know you can't go to, you can't get your glasses yourself, you can't go to the bathroom without somebody looking at you. He says with a gun at least out, but even so, at least an armed person watching you go to the bathroom. And he wasn't told, you know, you can just sit here. They say you can leave your own house, but you can't just stay here. Your Honor, I don't think that the record is clear that he was told you're free to leave as opposed to you're not going to be under arrest. Would you like to speak with us? And I think there's a distinction there in being able to choose to speak with the officers. He did choose to speak with them. He was told, you know, repeatedly, you're not going to be... This was all after he was handcuffed, kept in a police car. He was at gunpoint for a while, and so on. So even though it wasn't true at that moment, it was certainly part of the atmospheric. It was, Your Honor, but those were the atmospherics during the protective sweep at the beginning. And I think this Court in Crawford and the Tenth Circuit in Bennett have addressed similar situations where an initial protective sweep in which the officers are doing what officers do to maintain their safety in coming in and doing these protective sweeps detain individuals. In this case, they had seen the defendant sort of go back into his room. They had no idea what was going on, and so they detained him for a period. But that sense of initial custody, and the government has conceded that he was in custody when he was out and detained in the car, was dispelled after that point. He is brought inside to a different location, a familiar location. He is in a living room, which the Craighead Court pointed out was quite distinct from the... That is actually the only distinction between this case and Craighead, isn't it? No, Your Honor, I don't believe it is, because in Craighead there was also a detective who was standing sort of right in front of the door. My understanding is that he wasn't standing in front of the door. He was standing next to the door with his back against the wall is what the facts said. And he would have had to walk around him, but he didn't have to get him away from the door in order to get out. I apologize. I'll defer to your reading of those facts. But the sense that was there with the officer who was standing by the door was that there was an individual who was not involved in the interrogation who was going to keep this defendant from leaving. Again, this restraint, this sense of restraint. We have an absence of that here. We have a record that is very clear that there were no people sort of standing at the exits of the house trying to keep the defendant in. This is a large open room. He was sitting at his dining room table with two agents who had, although they were armed, their guns were in holsters underneath their... And another 10 officers who would have had to walk around him through to get out. I think the record indicated that there were six other officers inside conducting the search. And a couple outside. In other rooms of the house. In other rooms of the house. They were conducting the search. This was a two-story house, and so they could have been at multiple locations. The defendant's bedroom, as I understand it, was upstairs. And so I would presume that that would be... Ms. Williams, does your entire case based upon the earlier discussion depend on whether or not this defendant was in custody? In terms of the... In terms of the outcome. In other words, under the 11A2 agreement, if this gentleman was in custody, you lose, right? Under this one. With respect to the motion on the statement, Your Honor. Right. That's all he needs based upon what you've indicated, right? I believe that that is my reading of the plea agreement. Although that does not control, as I've maintained in my briefs, on the issue of the Miranda warnings. I guess what I struggle with, you know, I understand how difficult it is to do police work. I have great empathy for the hard work that's involved. It's very important for officers to be safe. But frankly, the government's position on whether this man was in custody renders the English language a nullity. I mean, how can you say you're not in custody when somebody's been locked in a police car with his hands in a handcuff, forced to crawl along the ground in a supine position. Then they bring him in, they've got 11 officers around, standing around. He wants to go to the bathroom, they take a gun out. I mean, come on. Let's be serious about this. How could he not be in custody? Well, Your Honor, I think not only does this Court's holding in Crawford as well as the Tenth Circuit's in Bennett find precisely that fact, but I think the defendant's own conduct. Those aren't the same facts, are they? Well, the Bennett case certainly is. We're not bound by the Tenth Circuit, I don't think. That is correct. They're a fine group of people, but we're not bound by them. That is correct. In the Crawford case, it was a parole search, and there were similar sort of – That's different. That's different. It's not a parole search. I understand the distinction, but that was the sort of closest analogy I could find. By distinction, I don't think that the defense has pointed to any cases where the initial protective search does taint the entirety of the search. Instead, what this Court has looked at typically – But it's the objective feeling of whether he felt he was free to leave. And I don't think – I just don't understand how, if we put you in that situation, how you would feel free to leave. Well, I think the record – It defies common sense. I think the record here on the multiple factors which this Court must – the five factors which this Court must look at, we have a session that was not confrontational. Come on. The Court has – Not confrontational with 11 police officers running around with guns, and they've had him in the back of the police car with handcuffs before. What did they say? Did you have a nice day? Did you go to church today? What did they say? They didn't do that. They did ask him if he would like to speak with them. They started the conversation by explaining who they were, so there wouldn't be any confusion as to why they were there. They introduced themselves. One of the things that the Craighead case points out is that when you have, as you did there and here, officers from a whole lot of different agencies in the location, the fact that one person tells him he's free to leave is not very much assurance that everybody else with all these different agendas aren't going to let him out the door. I think that is correct, Your Honor, although we don't have – that was one of the factors cited by the Craighead Court. But I don't think we have anything in the record here to suggest there's any similar confusion in the defendant's case. In the defendant's case, he was introduced to both of the individuals who were conducting the investigation. It was a postal inspector and FBI special agent. Was Crawford a case where the search was in his own house? I believe there was a parole search in his own house, and then he was subsequently taken to the FBI offices for interrogation. That's where the interrogation was. Yes. All right, but here he was in his own house. And, you know, I guess that cuts both ways. I mean, on the one hand, he's in his own house. On the other hand, it's not much – in terms of the impact of the free-to-leave notion, it's sort of useless to be told you're free to leave your own house. Where are you going to go? Which is what Craighead says in great length. Yes, Your Honor. It is true that the home is sort of a different circumstance, but the Craighead Court also – As to that particular issue, I mean, not – otherwise, they cut in the other direction. But as to the usefulness of that statement, it seems to me to be a different circumstance. I would tend to disagree, Your Honor. I think that that has been historically viewed as the most significant factor, that ability of – Is there any case in which somebody was in their own house and was told they were free to leave and that free-to-leave was regarded as dispositive? Or significant? I have not been able to find a case in the Ninth Circuit. I thought there was a Supreme Court case that talked about interviews. I think it was in a tax case by agents who conducted the interview in the suspect's living room and the Supreme Court found no Miranda warnings were required. That may be, Your Honor. I apologize. I'm not familiar with that. I guess the question I have is that it seems that our case law is going back to the now discredited focus of the investigation theory and giving no deference to the factual findings of the district court, which considered each of the five factors in what I think is a very fact-intensive inquiry in concluding that it was a non-custodial interrogation. And Your Honor is right. The district court did make several factual findings here, both about the way in which the interview was initiated, that he was asked. Well, those are clearly all binding. But I think what Judge Talman is saying, and I do understand our case law to be otherwise, is whether we owe deference to the ultimate conclusion about whether he was in custody. And I gather we don't. That's true. That's true. It is a de novo review with a clear error review as to the factual findings made by the district court. For example, the district court made a finding with regard to the fact that there had been a protective sweep and all of that, but that under the totality of the circumstances, when considering that he was told multiple times during the interview that he wasn't going to jail and so on, that in essence that taint had dissipated, if you will. And I guess that's an ultimate legal conclusion, but we still have to accept the district court's findings of fact unless we declare them clearly erroneous. Is that right? The findings of fact that sort of led to that conclusion. And then I will ask you to sit down. But what is the relevance of the statement that you're not under arrest? The statement that he's not under arrest is you're not going to be arrested today. You're not going to be arrested today. I don't think there is any, is there? Well, in this case, it was as to whether he was being detained or whether he was being truly restrained there and forced, you know, in a sense to speak with the agents or that he was not going to be able to leave the house that day. Well, if somebody said to him, you're not free to leave. You have to stay here and talk to us. You don't have any choice. But when we're finished, we're not going to arrest you. I mean, we're not going to arrest you now. It's not really relevant to the question of whether he's in custody while they're talking to him. Well, Your Honor, I think when you're being told that would you like to, being asked at the outset. No, but I'm asking you specifically whether the statement you're not going to be arrested today is of any significance in any of this. Well, I think it does go to the, as I said, I think this goes back to the question of whether he, the record indicates that he would have been allowed to stay and not speak with the agents. And I think that the record doesn't indicate that that is not, that wouldn't have necessarily been an option. He was told on multiple occasions that this was, you know, that he was not going to be arrested, that he was asked if he would like to speak with the agents. He did choose to do so and was very cooperative and effusive, as the district court found throughout, in a demeanor that was very nearly identical, according to Agent Franza, to the demeanor in the own self-initiated statements that came later. Okay. Thank you very much. I might let you go way past your time. Thank you. Useful discussion. I'll give you two minutes to wrap it up. Thank you, Your Honor. If I could just make three points. The first goes to the issue of the standard of review. I'm sorry, Your Honor. No, I'm looking at the clock, which is not right. Okay. Now it's right. Okay. I was just going to say there are three things I'd like to say. The first is with respect to the court's standard of review and the facts. In this case, there were essentially no disputed facts. They were either resolved by stipulation or modifications that the parties made, supplemented by some brief testimony of the agent, which was really not in controversy. I believe it's pages 225 through 227 of the excerpt of Clerk's record, in which we had a colloquy and the district court judge asked counsel for the government, do you concede that? And she said essentially, yes, I concede that the rendition that he gave is the facts upon which the court should make the finding. That's on the whole matter or on the issue of custody? It was on the issue of the guns. Of the guns. That he was held at gunpoint on the initial time in, that when he was brought in from being handcuffed to move his dog, the agent did not point at him but had the gun out of the holster and to the side, said if your dog acts up, I'll kill him. And then third, that when he was taken to the bathroom, at one point the agent, because I had said at gunpoint, it wasn't strictly at gunpoint, the gun was only pointed at him one time. The other two times, unholstered but out to the side. So I wanted to clarify that. The district court judge asked counsel, do you concede that? Is that true? She said yes. So essentially, you're here on an undisputed factual basis. There were no disputed facts. So this court's determination is purely de novo. Completely de novo. And since there were undisputed facts, the issue about deferring to factual findings of the district court does not apply. Secondly, Craighead controls this case. This case is worse in almost all relevant aspects than Craighead. More agents. The same isolation. And the interrogation was much longer in this case than Craighead. Do you want us to write a decision that basically says every in-home interview where there are multiple armed police officers present during the execution of a search warrant is by definition a custodial interrogation as a matter of law? Absolutely not, Judge Tolman. That's not what Craighead says. It says it's a four-factor test. No, no, no. The normal question for police interrogations at other locations is the five-factor test that was alluded to. But Craighead says when you're dealing with home interrogations, it's a four-factor test. And they specifically, Craighead says these are the four factors. Number of agents, and are they armed? Two, was the defendant isolated? Three, was he placed in detention at any point before this supposedly non-custodial interrogation by force or threat? And then fourth and finally, if he was told he was not in custody, what's the overall context? Those are the four questions under Craighead. And as to each of the factors in this case, the factors are more favorable to the appellant's position than they were even in the Craighead case. Thank you very much. Thank you so much. Thank you both for a very useful argument in what turns out to be an interesting case.
judges: Berzon, Tallman, Smith